256 P.3d 302 (2011)
171 Wash.2d 383
In the Matter of the DETENTION OF Gale WEST, Petitioner.
No. 82568-8.
Supreme Court of Washington, En Banc.
Argued May 27, 2010.
Decided May 5, 2011.
*305 Nancy P. Collins, Washington Appellate Project, Seattle, WA, for Petitioner.
David J.W. Hackett, King County Prosecutor's Office, Seattle, WA, for Respondent.
FAIRHURST, J.
¶ 1 A jury found Gale West to be a sexually violent predator (SVP), and the trial court entered a civil commitment order under chapter 71.09 RCW. The Court of Appeals affirmed. In re Det. of West, noted at 147 Wash.App. 1017, 2008 WL 4867147 (2008). West requests a new trial for two reasons. First, West claims he was prejudiced by the trial court's evidentiary rulings. Second, he believes he was entitled to discovery of the SVP evaluations done for other persons by the State's testifying expert witness, Dr. Leslie Rawlings. We affirm.

I. FACTUAL AND PROCEDURAL HISTORY
¶ 2 After West's 1974 conviction for two counts of sodomy, he was committed to Western State Hospital for treatment as a sex offender. Over two years later, he was discharged and declared not amenable to treatment. While West was on work release in 1981, he kidnapped and attempted to rape a girl and was later convicted and sentenced to 20 years of imprisonment. During his incarceration, state officials repeatedly recommended that he get treatment for sexual deviancy. He refused. He claimed the programs were ineffective, created a risk of additional punishment, and resulted in negative evaluations based on only brief interviews. Before West's scheduled release from prison, the State filed an SVP petition on June 4, 2002. Pending his civil commitment *306 trial, West was committed to the Special Commitment Center (SCC), where he voluntarily participated in the SCC's treatment program for 14 months. He quit treatment in 2003.

A. Evidentiary issues
¶ 3 Before trial, West moved to strike Dr. Henry Richards, the superintendent of the SCC, from the State's witness list. The trial court denied West's motion, ruling the State could "elicit testimony of a brief overview of the program in general and West's participation or lack of participation in the program." Clerk's Papers (CP) at 640. The court permitted West to "testify why he chose to terminate treatment, and give any information as to his understanding as to deficiencies in the treatment to support his reasons for terminating." Id. However, the court concluded, "This does not open the door to collateral evidence on the strengths and weakness[es] of the program, including federal litigation." Id. at 640-41.
¶ 4 Dr. Richards testified:
The Special Commitment Center's treatment program is, I would say, it really has three components. One is just the environment of the Special Commitment Center itself. So we have different environments that comprise part of the treatment.
The initial environment that a resident might enter would be our total confinement center on McNeil[ ] Island, and that facility, as implied, is really designed to contain an individual and provide all the supports and security that make treatment possible.
The other environments we have are our transition facilities, one on McNeil[ ] Island and one here in Seattle. Those facilities are different, have somewhat of a different treatment, and are designed to have more access into the community and transition into the community. So that first component of the treatment is the holding environment itself and the staff, rules comprised in that facility.
Verbatim Report of Proceedings (VRP) (Jan. 31, 2007) at 158-59. West objected, and the trial court told the State to move on. Dr. Richards' testimony continued:
[State]: At the facility on McNeil[ ] Island, are there phases of treatment in the treatment program?
[Dr. Richards]: Yes, there are. The cognitive behavioral treatment itself, the programs are directed by professional staff, consist of six phases of treatment, beginning with introduction, accepting and learning about one's disorders, all the way through to practicing, showing that you canyou've learned and mastered certain skills that will reduce your recidivism risk and that you have chosen and demonstrated that you'll likely continue to choose to exercise those skills in the future. So those are the phases one through six, with the sixth phase being a community transition phase.
Id. at 159. Dr. Richards further testified that West was held in the SCC and that he had participated in the voluntary treatment program for 14 months before stopping in 2003. West moved for a mistrial and, in the alternative, requested the court to instruct the jury that it was not to consider the community transition phases and must focus on the elements of an SVP finding. The court denied West's motion and did not instruct the jury. The jury did not ask Dr. Richards any follow-up questions.[1]
*307 ¶ 5 In closing arguments, the State did not discuss the SCC, the treatment generally available there, or its transition facilities. The prosecutor focused solely on the conclusions that the jury should draw from West's previous crimes, his treatment history or lack thereof, and Dr. Leslie Rawlings' assessment of West.

B. Pretrial discovery issue
¶ 6 At a pretrial deposition, Dr. Rawlings, the State's expert witness, told West's counsel that he had evaluated 37 other persons for SVP status and had concluded that 22 of them qualified as an SVP and 15 did not. West subsequently served Dr. Rawlings with a notice to continue the deposition. The notice included a subpoena duces tecum requesting Dr. Rawlings to produce copies of the SVP evaluations and risk assessments (hereinafter, collectively, evaluations) that Dr. Rawlings had done for the 37 other persons. These evaluations break down into three categories: (1) evaluations of persons for whom the King County prosecutor's office filed an SVP petition (the practice of King County is to attach evaluations to SVP petitions, and they thus become public records) and Dr. Rawlings testified at trial; (2) evaluations of persons for whom the attorney general's office (AGO) filed an SVP petition (the practice of the AGO is to attach evaluations under seal to SVP petitions) and Dr. Rawlings testified at trial; and (3) evaluations of persons for whom the State did not file an SVP petition and thus Dr. Rawlings did not testify. Dr. Rawlings refused to comply.
¶ 7 West filed a motion to compel, citing four reasons why he needed the documents:
[F]irst, it is important for the respondent to examine other reports for fact similarities and outcome consistency; second, it is important to know the circumstances under which Dr. Rawlings was unable to reach a conclusion and compare the evidence cited in those cases to the evidence he cites supporting his opinion in Mr. West's case; [third], we think it necessary to determine whether all those individuals whom Dr. Rawlings found did not meet the criteria submitted to interviews; and finally, to verify the claims Dr. Rawlings has made about his reports.
CP at 1011. The trial court ultimately quashed the subpoena in part, concluding that "reports generated by Dr. Rawlings for cases in which he was retained as a consulting expert by the state, and for which legal proceedings were not filed, were prepared in anticipation of litigation." CP at 519. The court concluded these reports were not discoverable because West had not "demonstrated a substantial need of the materials in the preparation of his case nor that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Id.
¶ 8 In an order clarifying the ruling and denying West's motion for reconsideration, the court stated that the evaluations filed under seal by the AGO were included in the protective order. The court acknowledged work product protections might not apply to the evaluations, but said the "privacy rights of those evaluated" justified the protection. CP at 525. West was free to discover only the evaluations by Dr. Rawlings that were attached to King County's SVP petitions.
¶ 9 At trial, Dr. Rawlings testified for two-and-one-half days, and the prosecutor began the direct examination of Dr. Rawlings by bolstering his credentials and objectivity, as follows:
Q: And when you're hired by the Joint Forensic Unit to do a sexually violent predator evaluation, is it expected that you're going to have any particular outcome when you do that evaluation, or not?
A: No, not at all.
Q. Okay. So what are the expectations when you conduct an evaluation for the Joint Forensic Unit?
A: The expectation is that you do a neutral, objective evaluation.
Q: Now, in yourI think you said you have done 37 or 38 sexually violent predator evaluations. Do you have a sense or a figure of how many times you have found somebody met criteria as a sexually violent predator, and *308 how many times you have found that they do not meet criteria?
[West objects. After a sidebar conference, the court overrules.]
Q: Dr. Rawlings, if you could tell the jury of the 37 or 38 sexually violent predator evaluations, how often have you found somebody has met criteria versus how many times they did not meet criteria?
A: Yes. Approximately 60 percent of the time it's been my conclusion that they have met the criteria, 40 percent of the time not.
VRP (Feb. 5, 2007) at 23-24.
¶ 10 The prosecutor relied on this testimony during closing argument after observing that Dr. Rawlings was "the only credentialed expert that you heard from." VRP (Feb. 13, 2007) at 9. (West had initially planned to call his own expert witness, Dr. Richard Wollert, who believed that West did not meet the criteria. But West did not actually call Dr. Wollert or any other expert.) In arguing why the jury should credit Dr. Rawlings' testimony, the prosecutor relied on the doctor's testimony about his 60 percent rate of finding an evaluated person as meeting the criteria for being an SVP:
Dr. Rawlings is a man who has been in the business of evaluating and treating
When the State of Washington passed the sexually violent predator statute in 1990, the State psychological association said he's the guy we want to chair the task force. Why? Because he's got the expertise.
Dr. Rawlings told you that he's conducted 37 or 38 of these sexually violent predator evaluations, and he explained to you that he gets these from the Joint Forensic Unit, and that 60 percent of the time he's found that somebody meets criteria. Why is that important? It's important because it shows his objectivity, and he explained to you if he says this person is not likely to reoffend, that's it.
Id.

C. Court of Appeals decision
¶ 11 In an unpublished opinion, the Court of Appeals affirmed. On the evidentiary issues, the Court of Appeals concluded that "any error" was harmless. West, 147 Wash. App. 1017, 2008 WL 4867147, at *8. On the discovery issue, the Court of Appeals held that West sought protected work product and failed to show substantial need for the documents. Id. at *4.
¶ 12 We granted West's petition for review. In re Det. of West, 166 Wash.2d 1032, 218 P.3d 195 (2009).

II. ANALYSIS

A. Evidentiary issues
¶ 13 We review a trial court's decision to admit or exclude evidence for an abuse of discretion. State v. Stenson, 132 Wash.2d 668, 701, 940 P.2d 1239 (1997). A trial court abuses its discretion when its decision "is manifestly unreasonable or based upon untenable grounds or reasons." Id.

1. Relevancy of Dr. Richards' testimony

¶ 14 Evidence must be relevant to be admissible. ER 402. In an SVP civil commitment trial, evidence is relevant only if it increases or decreases the likelihood that a fact exists that is consequential to the jury's determination whether the respondent is a sexually violent predator. See ER 401; RCW 71.09.060(1). This determination comprises three elements: "(1) that the respondent `has been convicted of or charged with a crime of sexual violence', (2) that the respondent `suffers from a mental abnormality or personality disorder', and (3) that such abnormality or disorder `makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility.'" In re Det. of Post, 170 Wash.2d 302, 310, 241 P.3d. 1234 (2010) (quoting RCW 71.09.020(18)[2]). Because relevance is a judgment *309 dependent on the surrounding facts, the trial court enjoys broad discretion in deciding whether evidence is relevant to these three elements. See In re Pers. Restraint of Young, 122 Wash.2d 1, 53, 857 P.2d 989 (1993).
¶ 15 The trial court acted within its discretion in concluding that Dr. Richards' testimony was relevant. The testimony provided context for the jury to weigh the significance of West's decision to stop participating in the SCC's voluntary treatment program. The jury could infer that West was less likely to be ableor willingto control his mental abnormality or personality disorder if living freely in the community. Based on this inference, the jury could find West was more likely to reoffend.
¶ 16 We recently concluded in Post that similar testimony about the SCC's treatment phases and confinement conditions was irrelevant in the SVP civil commitment trial of Charles Post. Post, 170 Wash.2d at 314, 241 P.3d 1234. In Post, the State used testimony about the SCC to argue that Post's best chance of avoiding recidivism was to complete treatment there. Id. at 307-08, 241 P.3d 1234. Post is distinguishable from this case. In Post, we expressly limited our review to evidence about SCC programs in which Post had not yet participated. Id. at 310, 241 P.3d 1234. Post did not challenge, and we declined to address, the lower court's conclusion that evidence of the SCC treatment Post had already undergone was relevant and admissible. Id. Here, unlike in Post, the purpose of the challenged testimony was to shed light on West's past treatment at the SCC, not to show the existence of preferable alternative treatments for the future. The brief testimony of Dr. Richards provided helpful background information for the jury to gauge the importance of West's decision to quit treatment as it related to his likelihood to reoffend.
¶ 17 However, the trial court should have given a limiting instruction in accordance with ER 105. Upon a party's request, ER 105 requires the court to "restrict the evidence to its proper scope and instruct the jury accordingly." When evidence is proper for one purpose but inadmissible for another purpose, a limiting instruction is usually required. State v. Redmond, 150 Wash.2d 489, 78 P.3d 1001 (2003). Here, a limiting instruction should have been given because West requested one and the State could have used Dr. Richards' testimony for two improper purposes.
¶ 18 First, when offered for the purpose of showing the respondent has a mental abnormality or a personality disorder, evidence of the SCC's treatment programs, confinement conditions, and transitional facilities is irrelevant and inadmissible, unless the testimony relates the respondent's treatment history. Certainly, the State is free to offer evidence of the treatment a sex offender should get and to compare that with the treatment the respondent has actually received. See Post, 170 Wash.2d at 313-14, 241 P.3d 1234. However, the mere availability of treatment at the SCC is no more relevant to diagnosis than is the availability of such treatment at a secure facility in California. What matters for diagnosis is the respondent's response to treatment options that were actually presented to him.
¶ 19 The other obviously improper purpose for evidence of the SCC's treatment programs, confinement conditions, and transitional facilities is to establish that total confinement or a less restrictive alternative would be prospectively better than unconditional release for reducing the respondent's risk of reoffense. Id. The jury must determine the SVP's dangerousness "if not confined in a secure facility." RCW 71.09.020(18) (emphasis added). Thus, while the SVP statute asks the jury to decide whether the respondent's risk of reoffense is so high that he should be committed to a secure facility, the statute does this by focusing the attention of the jury solely on what would happen if the respondent were living freely in the community. Post, 170 Wash.2d at 312, 241 P.3d 1234. RCW 71.09.060(1) makes this point explicit, instructing that the jury may consider "only placement conditions and voluntary treatment options that would exist for the person if unconditionally released." See also In re Det. of Turay, 139 Wash.2d 379, 404, 986 P.2d 790 (1999). To be sure, the State may offer evidence of the *310 treatment and placement conditions that are necessary to mitigate the respondent's dangerousness, and the State may offer evidence that these components are lacking in the respondent's proposed arrangements for unconditional release. Post, 170 Wash.2d at 313-14, 241 P.3d 1234. However, the fact that the SCC has the necessary conditions and treatment programs is not relevant for this purpose. Id.
¶ 20 To avoid the jury considering Dr. Richards' testimony for these improper purposes, West asked the trial court to instruct the jury that it was required to focus solely on the statutory elements of the SVP determination. Because there was no reason to refuse West's request, we conclude the trial court committed error.

2. Unfair prejudice and confusion of the issues

¶ 21 We next consider whether the trial court should have excluded Dr. Richards' testimony even though it was relevant. The trial court, in its sound discretion, may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." ER 403. A danger existed that the jury would base its SVP determination on its preference for the SCC or be misled into thinking it was supposed to determine whether West's risk of reoffense would be less if he were committed to the SCC. But the trial court carefully circumscribed Dr. Richards' testimony. He gave only a brief, generalized overview of the SCC before discussing the treatment program and West's choice to stop participating in it, focusing the jury on the proper purpose of whether West's decision to discontinue treatment would affect his ability to control his mental abnormality or personality disorder. When West objected, the court instructed the State to move on. In light of the relevance of Dr. Richards' testimony to the proper issue of the significance of West's decision to quit treatment, we conclude the trial court acted within its discretion.
¶ 22 West also argues that the testimony violated his right to a fair trial. This argument is not well developed, and we see no valid explanation for how Dr. Richards' probative, yet limited, testimony created an unfair trial.

3. Evidence of the federal injunction and the SCC's treatment success

¶ 23 West wanted to present evidence of the SCC's deficiencies and the federal injunction, as well as the efficacy of the SCC's treatment programs. Generally, evidence about the federal injunction that regulated the SCC for several years is irrelevant. Turay, 139 Wash.2d at 404, 986 P.2d 790. However, by offering evidence of West's decision to voluntarily quit the SCC treatment program, the State opened the door to West's rebuttal evidence explaining why he ceased treatment. Such rebuttal evidence about the SCC was relevant only if West knew about any deficiencies and they were a causal factor in West's decision. West did not say that the issues related to the federal injunction factored into his decision making, and nothing else in the record suggests that the federal injunction drove West's choice to quit treatment. Thus, the trial court acted within its discretion by excluding the evidence.
¶ 24 Turning to the evidence about the efficacy of the SCC's treatment programs, we consider such evidence's admissibility based on whether it is offered on cross-examination of the State's witness or direct examination during the defense's case. The trial court has discretion under ER 611(b) to limit cross-examination of a State's expert regarding the efficacy of the SCC's treatment programs because the scope of cross-examination should be limited to the issues raised on direct. In re Pers. Restraint of Duncan, 167 Wash.2d 398, 409, 219 P.3d 666 (2009). Because Dr. Richards did not directly discuss the efficacy of the SCC treatment programs, the trial court acted within its discretion in excluding West's cross-examination questions.
¶ 25 On direct examination during the defense's case, evidence about the efficacy of the SCC's treatment programs is ordinarily "`barely relevant'" to a "`side issue.'" Id. at 410, 219 P.3d 666 (quoting In re *311 Det. of Duncan, 142 Wash.App. 97, 109-10, 174 P.3d 136 (2007)). Here, such evidence was relevant as rebuttal evidence if it bore on West's decision to end his voluntary treatment at the SCC. It did. West testified about his skepticism of the SCC's treatment programs. Testimony from an expert corroborating West's understanding of the SCC treatment programs could have buttressed his claims and taken some of the sting from the inference that West quit treatment for the wrong reasons. Nevertheless, the trial court had discretion and acted within it by limiting the rebuttal evidence to West's testimony. See id. Doing so eliminated the danger that a minitrial would ensue on the success rate at the SCC.
¶ 26 West argues that the trial court's evidentiary rulings on these points violated his due process rights to present a defense and cross-examine the witnesses against him. We disagree. The trial court's application of the evidence rules sufficed.

B. Pretrial discovery issue
¶ 27 West challenges the trial court's order partially quashing West's subpoena duces tecum for Dr. Rawlings' SVP evaluations of other persons. Whether West is entitled to the prior SVP evaluations depends on whether CR 26(b)(4) or CR 26(b)(5) governs West's discovery request for expert information, and if CR 26(b)(5) does, whether the controlling provisions are those in subsection (b)(5)(A) for testifying experts or those in subsection (b)(5)(B) for nontestifying experts. We review a discovery order under CR 26 for an abuse of discretion. See T.S. v. Boy Scouts of Am., 157 Wash.2d 416, 423, 138 P.3d 1053 (2006).

1. CR 26(b)(4)general work product protections

¶ 28 CR 26(b)(4)[3] creates an immunity from discovery for "documents and tangible things" if the items were "prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative." This work product protection makes "no distinction between attorney and nonattorney work product." Heidebrink v. Moriwaki, 104 Wash.2d 392, 396, 402, 706 P.2d 212 (1985). The requesting party may obtain discovery only after showing "substantial need of the materials" and that the materials' "substantial equivalent" is not available through other means without "undue hardship." CR 26(b)(4). Even after this showing, however, the requesting party usually may not discover "the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." Id. This immunity for opinion work product is nearly absolute. Pappas v. Holloway, 114 Wash.2d 198, 211-12, 787 P.2d 30 (1990).

2. CR 26(b)(5) expert work product protections

¶ 29 CR 26(b)(5)[4] governs "[d]iscovery of facts known and opinions held by experts . . . *312 acquired or developed in anticipation of litigation or for trial." The requesting party does not have to meet the substantial need or undue hardship requirements of CR 26(b)(4). However, depending on whether the expert is expected to be called at trial, the rule creates its own unique modifications of the permissible methods and the general right to discovery set forth in CR 26(a) and (b)(1). See CR 26(b)(5)(A)-(B).
¶ 30 CR 26(b)(5)(A) provides liberal discovery rules for the work product of experts whom a party expects to call to testify at trial. Because modern litigation often involves "intricate and difficult issues as to which expert testimony is likely to be determinative," the aim of CR 26(b)(5)(A) is to make trials fairer and improve their truth-finding function by giving pretrial access to the other side's expert witnesses in order to prepare for cross-examination and rebuttal. Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery, Advisory Committee's Note, 48 F.R.D. 487, 503 (1970).[5] Accordingly, the rule gives parties the right to serve interrogatories regarding three topics: (1) the identity of the expert witnesses expected to testify, (2) "the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion," and (3) any other "information about the expert as may be discoverable under these rules." CR 26(b)(5)(A)(i). The rule also grants, as a matter of right, that a party may "depose each person whom any other party expects to call as an expert witness at trial," so long as the deposition complies with the remainder of CR 26 and the entirety of CR 30 and 31, which govern depositions. CR 26(b)(5)(A)(ii). The rule thus "permit[s] a party routinely to depose the expert witnesses of other parties expected to be called at trial." 3A KARL B. TEGLAND, WASHINGTON PRACTICE: RULES PRACTICE CR 26 author's cmts. at 618 (5th ed. 2006).
¶ 31 A nontestifying expert's opinions and factual knowledge implicate distinct concerns, and therefore discovery of this work product has a separate rule defined in CR 26(b)(5)(B). It does not limit the methods of discovery, unlike subsection (b)(5)(A), but it allows discovery only upon a heightened showing of "exceptional circumstances." CR 26(b)(5)(B).[6] Because the expert is not expected to testify at trial, the interests in effective cross-examination and rebuttal are not at issue. Instead, four contrary interests prevail:
(1) encouraging counsel to obtain necessary expert advice without fear that the adversary may obtain such information; (2) preventing unfairness that could result from allowing an opposing party to reap the benefits of another party's efforts and expense; (3) preventing a chilling effect on experts serving as consultants if their testimony could be compelled; and (4) preventing prejudice to the retaining party if the opposing party were allowed to call at trial an expert who provided an unfavorable opinion.
*313 8A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2032, at 94 n. 4 (3d ed. 2010).

3. Does CR 26(b)(4) or (5) apply to West's subpoena duces tecum?

a. Did the protections of either CR 26(b)(4) or (5) attach?

¶ 32 Because the protections outlined in CR 26(b)(4) and (5) apply only when the requested documents were prepared, acquired, or developed in anticipation of litigation, we are confronted with the threshold question of whether the disputed materials fall into this category. "[T]he test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." 8 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2024, at 502 (2010). "The work product doctrine does not shield records created during the ordinary course of business." Morgan v. City of Federal Way, 166 Wash.2d 747, 754, 213 P.3d 596 (2009) (citing Heidebrink, 104 Wash.2d at 396-97, 706 P.2d 212). In close cases, the inquiry is founded on the underlying purposes of work product protections and the expectations of the relevant actors. See Heidebrink, 104 Wash.2d at 400-01, 706 P.2d 212.
¶ 33 We think SVP evaluations are created because of the prospect of litigation. RCW 71.09.025(1)(b)(v) directs the state agency with jurisdiction over someone who potentially qualifies as an SVP to submit all relevant documentation to the local county prosecutor and the AGO. Among the required information is "[a] current mental health evaluation or mental health records review." RCW 71.09.025(1)(b)(v). Carrying out these requirements, the End of Sentence Review Committee (ESRC) has a member of the Joint Forensic Unit prepare a forensic psychological evaluation. If the psychologist concludes that the sex offender meets the statutory definition of an SVP, the ESRC forwards the relevant information to the prosecuting authority. This process was the one under which Dr. Rawlings prepared the disputed evaluations. Because the prospect of an SVP civil commitment trial was the reason he was requested to prepare these documents, any applicable work product protections attach.

b. Did CR 26(b)(4) or (5) apply?

¶ 34 The trial court and the Court of Appeals applied the CR 26(b)(4) standard of substantial need and undue hardship. This was incorrect; only CR 26(b)(5) could apply. As we recognized in Harris v. Drake, 152 Wash.2d 480, 486, 99 P.3d 872 (2004), CR 26(b)(4) provides that its substantive barriers of substantial need and undue hardship are "`[s]ubject to the provisions of subsection (b)(5).'" And, by the terms of CR 26(b)(5), discovery of facts held by an expert "may be obtained only as" provided in CR 26(b)(5). Thus, CR 26(b)(5) carves out a world unto itself for expert work product.
¶ 35 This textual reading of the rules is reinforced by a reference to their purposes. Adding the substantive barriers of substantial need and undue hardship on top of CR 26(b)(5)(B)'s safe harbor for nontestifying expert work product would create needlessly duplicative protections. More troubling, the liberal discovery rule for testifying experts would be no more. Rather than having interrogatories and depositions as a matter of right, a requesting party would have to establish a substantial need for the materials and undue hardship. We think this would be a return to the dangers that CR 26(b)(5)(A) was designed to avoid. See Advisory Committee's Note, 48 F.R.D. at 503.
¶ 36 We reject the idea that CR 26(b)(5) applies through trial but CR 26(b)(4) attaches once trial concludes. We have held that the work product protections of CR 26(b)(5)(B) for nontestifying expert work product continue even after litigation concludes. See Pappas, 114 Wash.2d at 210, 787 P.2d 30; Harris, 152 Wash.2d at 489-90, 99 P.3d 872. We reasoned that protecting work product after trial is justifiable because doing so furthers the underlying purposes of existing pretrial protections. See Pappas, 114 Wash.2d at 210, 787 P.2d 30. Accordingly, where the liberal discovery rule in CR 26(b)(5)(A) lacks protections for testifying expert work product before trial, we see no *314 reason for retroactively creating such protections when trial concludes. Once CR 26(b)(5)(A) attaches to an expert's work product, it continues after the litigation ends.
¶ 37 Finally, we clarify any confusion from our decision in In re Firestorm 1991, 129 Wash.2d 130, 916 P.2d 411 (1996). The lead opinion signed by four justices concluded that CR 26(b)(5) applies, but CR 26(b)(4) does not, when the object of discovery is a fact acquired or an opinion developed by a nontestifying expert in anticipation of litigation. Firestorm, 129 Wash.2d at 137, 916 P.2d 411. We agree, based on the text of the rules and their overarching purposes, with one important caveat. CR 26(b)(5) pertains only to the "facts known and opinions held by experts." (Emphasis added.) We do not say that "the mental impressions, conclusions, opinions, or legal theories of an attorney . . . concerning the litigation," CR 26(b)(4), are subject to discovery under CR 26(b)(5).
¶ 38 Because West's subpoena sought factual knowledge and opinions held by an expert and developed in anticipation of litigation, the specialized rules of CR 26(b)(5) attached, to the exclusion of CR 26(b)(4). The State makes no claim that discovery of the information from Dr. Rawlings would reveal the opinion work product of an attorney.

4. Did CR 26(b)(5)(A) or (B) permit the trial court to quash the subpoena?

¶ 39 Because the protections of CR 26(b)(5) continue after litigation, whether CR 26(b)(5)(A) or (B) applies depends on the expert's status at the time the protections of CR 26(b)(5) originally attached. Once an expert is a nontestifying expert for a case, the only way this status changes is by changing the expert's designation to a testifying witness in that case.
¶ 40 Therefore, for the 22 SVP trials in which Dr. Rawlings testified, the liberal discovery rule of CR 26(b)(5)(A) applies to the SVP evaluations. The trial court correctly permitted discovery of the SVP evaluations that King County filed publicly. However, the trial court abused its discretion by quashing West's subpoena for the SVP evaluations that the AGO filed under seal because CR 26(b)(5)(A) requires no showing of substantial need or exceptional circumstances.[7]
¶ 41 Although CR 26(b)(5)(A) explicitly permits only interrogatories and depositions, not requests for production of documents, the history and purposes of CR 26(b)(5)(A), as well as the overall structure of the discovery rules, suggest that the drafters of CR 26(b)(5)(A) intended to allow discovery of a testifying expert's written work product. Former CR 26(b) (1967) prohibited discovery of an expert's written opinions, but this provision was deleted in the 1972 amendments to the rule that created CR 26(b)(5).[8] Further, CR 26(b)(5)(A) stipulates that the deposition must be taken in accordance with CR 30 and 31. CR 30(b)(1) expressly contemplates that a subpoena duces tecum requesting documents may be served on a nonparty as part of an oral deposition. In fact, until the 2007 amendments to CR 45, the only method of requesting documents from a nonparty was a subpoena duces tecum served under former CR 45 (1993) in tandem with a deposition. The practice in Washington was to obtain documents from nonparties by noting a deposition and serving a subpoena duces tecum. Instead of asking any questions at the deposition, the requesting party would simply collect the documents. See 3A Tegland, supra, at 742-43. Therefore, when CR 26(b)(5)(A) was adopted, the drafters needed only to mention depositions in order to grant access to documents. CR 26(b)(5)(A) therefore permitted the subpoena duces tecum in West's case, and the trial court abused its discretion by quashing it.[9]
*315 ¶ 42 With respect to the evaluations prepared in the 15 cases where Dr. Rawlings did not testify, the protections of CR 26(b)(5)(B) apply, and so West must show "exceptional circumstances" justifying discovery. To show "exceptional circumstances," the requesting party must establish that "it is impracticable . . . to obtain facts or opinions on the same subject by other means." Harris, 152 Wash.2d at 486, 99 P.3d 872. West fails to meet this burden. The subject matter of his discovery request was related to Dr. Rawlings' skill, knowledge, bias, and credibility. West had several other means to obtain material on the same subject. He had access to the SVP evaluations that Dr. Rawlings did for King County-prosecuted cases, and he had the right to the evaluations for the AGO-prosecuted cases. Further, West had the right under CR 26(b)(5)(A) to discover information about Dr. Rawlings' education, his professional background, and the bases for his opinion about West. Finally, although West did not choose to, he had the right, at public expense, to call an expert witness in his defense. See RCW 71.09.050(2). Such an expert could have challenged Dr. Rawlings' methods. Therefore, West did not make an adequately compelling showing that discovery of Dr. Rawlings' work product as a nontestifying expert was the only way to access information about his qualifications, bias, and credibility.
¶ 43 We hold, therefore, that the trial court abused its discretion under CR 26(b)(5)(A) by denying discovery of SVP evaluations in cases where Dr. Rawlings testified, but acted within its discretion under CR 26(b)(5)(A) in denying the request for the SVP evaluations in the cases where he did not testify.[10]

C. Harmless error
¶ 44 "Evidentiary error is grounds for reversal only if it results in prejudice. . . . An error is prejudicial if, `within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" State v. Neal, 144 Wash.2d 600, 611, 30 P.3d 1255 (2001) (citation omitted) (quoting State v. Smith, 106 Wash.2d 772, 780, 725 P.2d 951 (1986)). We think errors in pretrial discovery rulings in SVP cases are also subject to this same harmless error standard.
¶ 45 We conclude the evidentiary and discovery errors here were harmless. Unlike in Post, where we found prejudicial error, the State did not use the evidence about the SCC's treatment programs, confinement conditions, and transitional facilities to argue that committing West was the better alternative. Dr. Richards' testimony was brief and relatively minor in a trial with seven full days of witness testimony. The State's closing argument focused narrowly on the statutory elements of the SVP determination. The jury heard ample testimony from several witnesses about West's long history of sexual misconduct, which was much more extensive than the crimes for which he was convicted. Further, the State presented evidence about West's pattern of refusing to obtain treatment, and of his previous reoffense when he was last released to the community in 1981. The jury heard evidence that West had a sparse plan for controlling his behavior if he were released, and Dr. Rawlings carefully explained his forensic evaluation of West. Dr. Rawlings was the only expert who testified; no other expert witness claimed that West did not have a mental abnormality or personality disorder. Although West should have received more discovery than he did, West still had access to Dr. Rawlings' evaluations from King County-prosecuted cases, and West had a full day of trial time to cross-examine Dr. Rawlings. In these circumstances, we find it highly unlikely that the *316 outcome of the trial was materially affected by the errors here.

III. CONCLUSION
¶ 46 We reject West's argument that the testimony of Dr. Richards about the SCC's treatment phases, confinement conditions, and community transition programs was inadmissible under ER 402 and 403. We also reject West's contention that he should have been permitted to cross-examine Dr. Richards on the efficacy of the treatment programs at the SCC and to present evidence about the federal case on the unconstitutionality of the conditions at the SCC. We hold the trial court acted within its discretion in admitting Dr. Richards' testimony and limiting West's rebuttal evidence to his own opinions about the SCC's treatment programs. However, the trial court erred by refusing to give a limiting instruction.
¶ 47 We agree only in part with West's argument that the trial court abused its discretion under CR 26 by partially quashing the subpoena duces tecum that West served on the State's testifying expert witness, Dr. Rawlings, for his prior evaluations of 37 other persons for SVP status. Some of these persons were brought to an SVP trial where Dr. Rawlings testified as an expert, and some were not. Because the evaluations were prepared in anticipation of litigation by an expert, they were subject to CR 26(b)(5). No special showing of need was necessary for the reports involving cases where Dr. Rawlings testified, and West's subpoena was a permissible discovery method under CR 26(b)(5)(A). Thus, it was improper to quash the subpoena with respect to Dr. Rawlings' expert work product for cases where he testified. However, West fails to show the exceptional circumstances required under CR 26(b)(5)(B) to obtain the work product prepared when Dr. Rawlings was a nontestifying expert. Therefore, the trial court did not abuse its discretion with respect to the SVP evaluations for the 15 cases that were never brought to trial.
¶ 48 Although some errors occurred, they were harmless. We affirm the decision of the Court of Appeals, although on different grounds.
WE CONCUR: CHARLES W. JOHNSON, GERRY L. ALEXANDER, TOM CHAMBERS, SUSAN OWENS, JAMES M. JOHNSON and DEBRA L. STEPHENS, Justices.
MADSEN, C.J. (concurring).
¶ 49 I agree with the result reached by the majority. However, I write separately because I continue to believe, as I explained in my concurrence in In re Firestorm 1991, 129 Wash.2d 130, 153, 916 P.2d 411 (1996) (Madsen, J., dissenting), that when CR 26(b)(4) states that its provisions are "[s]ubject to the provisions" of CR 26(b)(5), it means that insofar as provisions in CR 26(b)(5) are different from those in CR 26(b)(4), CR 26(b)(5) controls. It does not mean that if CR 26(b)(5) applies to discovery sought from an expert, then CR 26(b)(4) cannot apply at all. Instead, by its plain language and the purposes of the two subsections, when discovery is sought from experts the work product rule of CR 26(b)(4) is not thereby rendered wholly irrelevant and inapplicable. Rather, a party's expert might possess information that may and should be protected by the work product doctrine and CR 26(b)(4)'s requirement of a showing of "substantial need."
¶ 50 Although I concur with the result in this case, we should not be surprised when we are presented with a case where, following the majority's interpretation of CR 26, we are led to an anomalous and unfortunate result.
SANDERS, J.[*] (dissenting).
¶ 51 The majority permits inadmissible testimony by Dr. Henry Richards in Gale West's sexually violent predator (SVP) trial and quashes West's subpoena duces tecum for documents with which to impeach Dr. Rawlings' testimony. Because admission of Richards' testimony was not harmless error *317 and West was erroneously precluded from obtaining all of Rawlings' evaluations, notwithstanding his objectionable testimony about the results of nondisclosed evaluations, I dissent.

Relevancy of Dr. Richards' Testimony
¶ 52 Dr. Richards'[1] testimony about the Special Commitment Center's (SCC) treatment phases, confinement conditions, and community transition programs was irrelevant and inadmissible. The proper focus of a civil commitment trial must be on the individual's mental health and likelihood of reoffending as a result thereof, not on general confinement conditions and programs. In re Pers. Restraint of Duncan, 167 Wash.2d 398, 409-10, 219 P.3d 666 (2009). The State argues West was more likely to reoffend "due to his failure to complete SCC treatment that was available to him." State's Suppl. Br. at 9. The issue, however, under the statute is whether he is likely to reoffend as a result of a mental disorder, not how effective treatment may be. Moreover, West's failure to complete the voluntary treatment program is not relevant to show West would receive, allegedly, more effective treatment if confined at the SCC, nor is that consideration relevant in itself.
¶ 53 This court previously addressed the relevance of confinement conditions in In re Detention of Turay, 139 Wash.2d 379, 986 P.2d 790 (1999). In Turay, the respondent in an SVP commitment trial sought to introduce evidence about the conditions of confinement at the SCC and a federal court verdict that the SCC had violated his constitutional right to adequate mental health treatment. Id. at 385-86, 403, 986 P.2d 790. The Court of Appeals upheld the trial court's exclusion of such evidence, holding, "The trier of fact's role in an SVP commitment proceeding. . . is to determine whether the defendant constitutes an SVP; it is not to evaluate the potential conditions of confinement." Id. at 404, 986 P.2d 790. And yet evidence of confinement conditions was precisely what was admitted in this case. This was manifest error under Turay.
¶ 54 Further, RCW 71.09.060(1) prohibits testimony about the treatment West would receive if committed. That statute unambiguously states, "In determining whether or not the person would be likely to engage in predatory acts of sexual violence if not confined in a secure facility, the fact finder may consider only placement conditions and voluntary treatment options that would exist for the person if unconditionally released from detention on the sexually violent predator petition." RCW 71.09.060(1) (emphasis added). What treatment West had or could have had at the SCC if committed is neither a voluntary treatment option nor a placement condition he would have had if unconditionally released. The statute, therefore, bars admission of this evidence.
¶ 55 The admission of Richards' testimony is also barred under RCW 71.09.020(18). The determination of relevance in an SVP civil commitment trial is comprised of three elements: "(1) that the respondent `has been convicted of or charged with a crime of sexual violence,' (2) that the respondent `suffers from a mental abnormality or personality disorder,' and (3) that such abnormality or disorder `makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility.'" In re Detention of Post, 170 Wash.2d 302, 241 P.3d 1234 (2010) (quoting RCW 71.09.020(18)). Contrary to the State's assertions, State's Ans. to Pet. for Review at 5, West's treatment experience does not fall under any of the SVP determining factors; it is not central to his current diagnosis nor his risk of reoffending.
¶ 56 In Post, the State introduced evidence about the treatment available to Post if he were civilly committed and the possibility of future release to a less restrictive alternative. Post argued evidence about the treatment and possibility of future release to a less restrictive alternative if committed as an SVP is irrelevant to the determination of whether he is currently an SVP. The court agreed and held the erroneous admission of the evidence was not harmless.
¶ 57 Likewise, the analogous situation here makes the error not harmless. The explanations of the treatment programs and transition *318 facilities at the SCC have no relevance to any part of the statute. The existence of the SCC programs have nothing to do with whether West was convicted or charged with a crime, whether he suffers from a mental abnormality or personality disorder, or whether he is likely to engage in predatory acts of sexual violence as a result thereof if he is not confined. Instead, the admission of this testimony serves to bias the jury toward committing West as an SVP. This testimony draws the jury's focus away from whether West has a mental abnormality that would increase his chances of reoffending to the expansive treatment programs available if committed. Dr. Richards' testimony does not rebut West's treatment plan but instead presents an alternative to itan irrelevant alternative to the question of whether West's plan will be successful. It is inconsequential the jury did not ask Richards any follow-up questions regarding the treatment available at the SCC. It is also irrelevant the State did not discuss the treatment available at the SCC or its transition facilities in closing arguments. The jury was already tainted with this inadmissible testimony and we cannot know its effect.
¶ 58 The majority attempts to distinguish the Post holding that testimony about the SCC's treatment phases and confinement conditions are irrelevant in SVP commitment trials. The majority says West's case is different because Post did not consider the relevancy of evidence on the treatment phases and confinement conditions Post had actually experienced and there was nothing to suggest Post quit voluntary treatment at the time of trial. Majority at 308-09. However, these are side issues that do not address the fact Post holds Richards' testimony irrelevant and therefore inadmissible. See Duncan, 167 Wash.2d at 410, 219 P.3d 666. The court abused its discretion when it admitted Richards' irrelevant testimony. This testimony violated ER 102, ER 402, and Turay.

Pretrial Discovery IssueSubpoena Duces Tecum
¶ 59 Moreover, the trial court abused its discretion when it denied West the opportunity to summon relevant evidence by subpoena duces tecum. Rawlings used alleged prior work product to bolster his credibility, claiming 40 percent of the people he evaluates for the State are not SVPs in his estimation. There are three elements to an SVP determination but Rawlings' credibility is not one of them. While the jury may consider Rawlings' credibility to assess how much weight to give his testimony, it was not necessary for the State to introduce Rawlings' statistics to prove a required statutory element. West objected to the introduction of Rawlings' claim at trial in part because West had been denied discovery necessary to refute it,[2] Verbatim Report of Proceedings (VRP) (Feb. 5, 2007) at 24, yet the court allowed it anyway. The State's decision to emphasize Rawlings' impartiality opened the door to the subject of his credibility, certainly making it fair game on cross-examination.
¶ 60 "`[I]t is rarely justifiable for the prosecution to have exclusive access' to relevant facts."[3]United States v. Salerno, 505 U.S. 317, 323-24, 112 S.Ct. 2503, 120 L.Ed.2d 255 (1992) (quoting Dennis v. United States, 384 U.S. 855, 873, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966)). West has a constitutional right to "`a meaningful opportunity to present a complete defense',"[4] which includes vigorous cross-examination.[5]Crane v. *319 Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (quoting California v. Trombetta, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)). That opportunity would be an empty one if the State were permitted to preclude a challenge to Rawlings' claim.
¶ 61 Rawlings' claim the fact that he finds evaluated individuals are not SVPs 40 percent of the time lends credence to his assertions of objectivity and impartiality. However, the State was improperly allowed to insulate its expert from full, fair, and effective cross-examination by claiming a work-product privilege for materials Rawlings prepared at the State's request and that the State purports to use to prove Rawlings' fairness and lack of bias.[6] "It would be manifestly unfair to allow a party to use the privilege to shield information which it had deliberately chosen to use offensively." CP Kelco U.S. Inc. v. Pharmacia Corp., 213 F.R.D. 176, 179 (D.Del.2003). But the State here did just that: have its cake and eat it too. And the majority erroneously allows this to happen.
¶ 62 The majority misapplied the narrower discovery rule CR 26(b)(5), which addresses experts expected to be called at trial and experts not expected to be called at trial. But this rule does not address the scenario here, where an expert's work in other cases is put at issue by the State.
¶ 63 Even if we assume, arguendo, that CR 26(b)(5)(B) did apply to Rawlings' reports in the 15 cases where he did not testify, these reports are not shielded from discovery under the rule because West demonstrates the requisite "`exceptional circumstances'" justifying discovery. The majority asserts the "exceptional circumstances" requirement is not met, claiming West has not established that "`it is impracticable . . . to obtain facts or opinions on the same subject by other means.'" Majority at 315 (alteration in original) (quoting Harris v. Drake, 152 Wash.2d 480, 486, 99 P.3d 872 (2004)). The subject here is the content of 15 evaluations where Rawlings claims he concluded SVP requirements were not met. West meets this standard by the simple fact he does not have any other source for discovering the contents of those 15 evaluations not produced, where Rawlings asserts he did not make an SVP finding. Further, the alleged information in these 15 cases is not the same information as the 22 cases where Rawlings did testify based on an SVP finding. Maybe Rawlings was not telling the truth[7] or maybe Rawlings was influenced by his employer;[8] facing indefinite confinement, West has a right to challenge this expert's alleged impartiality.
¶ 64 Instead of CR 26(b)(5), the rule applicable where a party is seeking an expert's work-product in other cases is CR 26(b)(4). Expert work-product in other cases should be analyzed as any other nonattorney work-product under CR 26(b)(4), i.e., expert work-product in other cases is not subject to CR 26(b)(5). CR 26(b)(4) creates an immunity from discovery for items in the broad category of "documents and tangible things" if "prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative." But this immunity is not absolute. A requesting party *320 may obtain discovery if a "substantial need of the materials" exists and the materials' "substantial equivalent" is not available through other means without "undue hardship." CR 26(b)(4). As discussed above, West has shown "substantial need" for the 15 non-SVP reports because the information does not exist elsewhere and the State is offensively using the alleged privilege against disclosure.[9]
¶ 65 Heidebrink v. Moriwaki,[10] 104 Wash.2d 392, 402, 706 P.2d 212 (1985), recognizes "the possibility of impeachment alone" is insufficient to show substantial need and undue hardship under CR 26(b)(4) where the requesting party has another source for the same information.[11] It is true West was free to discover information about Rawlings' education, professional background, and the bases for his opinion about Westbut these inquiries do not shed light on Rawlings' assertions about his lack of bias and credibility based on nondisclosed evaluations.[12] The majority and lower courts found West did not have substantial need for Rawlings' non-SVP reports because some of Rawlings' SVP reports had been publically filed in other SVP cases. However, those reports offer no insight into the unfiled cases[13] where we are told Rawlings found the State should not seek to commit an offender as an SVP.
¶ 66 The trial court's denial of the subpoena duces tecum violated West's federal and state constitutional right to present a meaningful defense. And admission of prohibited, irrelevant testimony was not harmless error.
¶ 67 Accordingly, I dissent.
NOTES
[1] Because SVP trials are civil in nature, jurors may ask questions of the witnesses. CR 43(k). West claims that the jurors asked Dr. Richards follow-up questions about the SCC. But the jury questions he cites were directed to Thomas Moore, a worker at Western State Hospital when West was there in the 1970s, regarding Western State Hospital's programs, as well as questions to Dr. Savio Chan, a retired psychologist who worked at the Department of Corrections' Twin Rivers Corrections Center and evaluated West in 1980, regarding the treatment programs at Twin Rivers and West's participation there, and finally questions to Dr. Leslie Rawlings, the State's expert witness who opined West meets the SVP criteria, regarding West's age, the risk effect of failing to complete treatment, the existence of risk assessments showing West's likelihood to reoffend as less than 50 percent, and the sample sizes of nontreated sex offenders in the empirical studies. The jury did not ask follow-up questions about the conditions or treatment phases at the SCC.
[2] The pertinent statutory subsection in effect at the time of the SVP petition filing against West was former RCW 71.09.020(16) (2002). The definition is the same today. A 2009 legislative amendment, which did not pertain to the statutory definition of SVP, renumbered the subsection to .020(18). See Laws of 2009, ch. 409, § 1.
[3] CR 26(b)(4) provides, in relevant part:

Subject to the provisions of subsection (b)(5) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subsection (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.
[4] CR 26(b)(5) provides:

Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subsection (b)(1) of this rule and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows:
(A)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion, and to state such other information about the expert as may be discoverable under these rules. (ii) A party may, subject to the provisions of this rule and of rules 30 and 31, depose each person whom any other party expects to call as an expert witness at trial.
(B) A party may discover facts known or opinions held by an expert who is not expected to be called as a witness at trial, only as provided in rule 35(b) or upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means.
(C) Unless manifest injustice would result, (i) the court shall require that the party seeking discovery pay the expert a reasonable fee for time spent in responding to discovery under subsections (b)(5)(A)(ii) and (b)(5)(B) of this rule; and (ii) with respect to discovery obtained under subsection (b)(5)(A)(ii) of this rule the court may require, and with respect to discovery obtained under subsection (b)(5)(B) of this rule the court shall require the party seeking discovery to pay the other party a fair portion of the fees and expenses reasonably incurred by the latter party in obtaining facts and opinions from the expert.
[5] Because 1972 amendments were modeled on the federal rules, we consider the federal advisory committee comments to be highly persuasive authority on their meaning.
[6] CR 26(b)(5)(B) allows discovery without any showing of exceptional circumstances if the expert information involves a mental or physical examination ordered pursuant to CR 35.
[7] We were not presented with the privacy issues that animated the trial court's analysis for some of the evaluations. We therefore do not consider them.
[8] CR 26(b)(5) was originally numbered (b)(4). The current numbering came with the 1990 amendments. See 3A Tegland, supra. For the sake of clarity, we refer to the current numbering.
[9] Some authority suggests that a bare subpoena duces tecum, separated from the deposition procedure, is not permissible under CR 26(b)(5)(A). See Marsh v. Jackson, 141 F.R.D. 431, 433 (W.D.Va.1992) (interpreting the federal analogue of CR 26(b)(5)(A), which also mentions only depositions, and holding that a bare subpoena duces tecum is not permitted). West, however, served the subpoena duces tecum in tandem with a deposition notice.
[10] West also argues that the trial court's decision violated his due process rights to present a defense and cross-examine the witnesses against him. We disagree. Although CR 26 might have been violated, West was still free to depose Dr. Rawlings, he had access to the SVP evaluations done in cases prosecuted by King County, and he cross-examined Dr. Rawlings for a full day of trial. Further, West had the right to present his own expert's testimony. We do not think due process requires more.
[*] Justice Richard B. Sanders is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).
[1] Dr. Richards had never treated West and had no personal knowledge of his needs.
[2] This court did not have access to a transcript of the sidebar conference. However at oral argument, West's attorney stated the comment at sidebar was, "because we were denied discovery this should not have been allowed, in all fairness." Wash. Supreme Court oral argument, In re Detention of Gale West, No. 82568-8 (May 27, 2010), 37 min., 11 sec., audio recording by TVW, Washington State's Public Affairs Network, available at http:www.tvw.org.
[3] Broad access to discovery is the centerpiece of a fair trial. "Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." Hickman v. Taylor, 329 U.S. 495, 507, 67 S.Ct. 385, 91 L.Ed. 451 (1947).
[4] Due process protections apply to civil commitment trials. In re Det. of Young, 122 Wash.2d 1, 48, 857 P.2d 989 (1993); In re Det. of Stout, 159 Wash.2d 357, 369-70, 150 P.3d 86 (2007).
[5] "[I]t is important to the proper cross-examination of an expert witness that the adverse party be aware of the facts underlying the expert's opinions, including whether the expert made an independent evaluation of those facts, or whether he instead adopted the opinions of the lawyers that retained him." Elm Grove Coal Co. v. Director, Office of Workers' Comp. Programs, 480 F.3d 278, 301 (4th Cir.2007).
[6] Rawlings has testified for the State favoring civil commitment on 22 occasions. He has never testified on behalf of an individual facing commitment. VRP (Feb. 6, 2007) at 111.
[7] The State argues that "it is unlikely that a licensed professional would lie on such a basic matter." State's Ans. to Pet. for Review at 15. However, even Rawlings cannot escape human nature; Rawlings is dependent on the State for his fee. At the time of West's trial, Rawlings' pending bill to the State for his work on West's case was $46,000. Perhaps future employment contracts with the State depend on Rawlings "finding" an outcome satisfactory to his client. Only the evaluations would put this concern to rest.
[8] "[T]he impact of expert witnesses on modern-day litigation cannot be overstated; yet, to some, they are nothing more than willing musical instruments upon which manipulative counsel can play whatever tune desired. . . . Thus, full, effective cross examination is critical to the integrity of the truth-finding process." Karn v. Rand, 168 F.R.D. 633, 639 (N.D.Ind.1996) (citations omitted).
[9] "The clearest case for ordering production is when crucial information is in the exclusive control of the opposing party." Pappas v. Holloway, 114 Wash.2d 198, 210, 787 P.2d 30 (1990); Heidebrink, 104 Wash.2d at 401, 706 P.2d 212.
[10] Heidebrink is not directly on point; it involves work product for that case, not a previous case. The work product at issue was a statement by a party, fully-subject to deposition and cross-examination. A nonparty expert's work is distinguishable because of the difficulty in evaluating it and its ability to mislead. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 595, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Furthermore, the Heidebrink court suggests a case-by-case analysis: "[T]he better approach to the problem is to look to the specific parties involved and the expectations of those parties. With these parties in mind, the scope of CR 26(b)(3) should provide protection when such protection comports with the underlying rationale of the rule to allow broad discovery, while maintaining certain restraints on bad faith, irrelevant and privileged inquiries in order to ensure just and fair resolutions of disputes." Heidebrink, 104 Wash.2d at 400, 706 P.2d 212 (what was formerly CR 26(b)(3) is now (b)(4)).
[11] An SVP evaluation report contains, at a minimum, a complete social and sexual history, complex judgments regarding volitional impairment, predictive statements focused specifically on sexual violence, and an analysis of standard clinical data on likely risk factors and mathematical quantification of risk based on scale scores. It would be impossible for Dr. Rawlings, or any other expert, to answer questions under oath as to an exact methodology and the resulting determination without first consulting that evaluation. If a witness uses a writing to refresh his memory for the purposes of testifying, an adverse party is entitled to have that writing produced, if the interest of justice so demands. ER 612. Accordingly, the "fact similarities and outcome consistency" and underlying methodology used to determine the alleged 40 percent statistic was not available to West, absent access to Rawlings' reports.
[12] West did not seek these reports primarily for impeachment; rather this information was important to compare other individuals' patterns of sexually offending behavior with West's own history. West could not challenge Rawlings' bias or inconsistency without assessing the basis of his claimed independence.
[13] Comparing the negative evaluations would yield important information about Rawlings' assessments of dangerousness for other sexual offenders, including the type of offenses, the number of victims involved, previous diagnoses, the age of the offenders, the amount of time they spent in prison, and the individual's amenity to speaking with the evaluator.